# IN THE SUPREME COURT OF TEXAS

═══════════
No. 10-0491
═══════════

HEARTS BLUFF GAME RANCH, INC., PETITIONER,

v.

THE STATE OF TEXAS AND
THE TEXAS WATER DEVELOPMENT BOARD, RESPONDENTS

═══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════

JUSTICE HECHT, joined by JUSTICE MEDINA and JUSTICE WILLETT, dissenting.

Protecting property rights is "one of the most important purposes of government."[1] So is pursuing the public good. These purposes can conflict, as for example, when the government determines that a landowner's free use of his property must be regulated to prevent public harm. "'[I]f regulation goes too far it will be recognized as a taking'",[2] and the government must adequately compensate the landowner. Another example is when government's own interests in the ownership or use of specific property conflict with the landowner's. That is this case. Hearts Bluff acquired some 4,000 acres of bottomland to enroll in the Army Corps of Engineers mitigation bank program,

---

[1] *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977).

[2] *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 670 (Tex. 2004) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

providing a means of offsetting others' damage to wetlands. The State has long had its eye on the same site for a water-supply reservoir but has never reached a decision on whether to move forward with such a project. Hearts Bluff's use of the property as a mitigation bank could preclude the State's acquisition of the property and would certainly increase the property's value and make it much more expensive to condemn. Acting in its own interest, the State has persuaded the Corps to reject Hearts Bluff's application, apparently the first time the Corps has ever rejected a mitigation bank application.

In *City of Austin v. Teague*, we stated that "when the government's action against an economic interest of an owner is for its own advantage",[3] the owner is entitled to adequate compensation under Article I, Section 17 of the Texas Constitution.[4] We quoted the following from the court of appeals' opinion in *San Antonio River Authority v. Garrett Brothers*:

> The social desirability of leaving government free to seek its own enrichment at the expense of those whom it governs under the guise that it has the power to regulate harmful conduct is not readily apparent. To permit government, as a prospective purchaser of land, to give itself such an advantage is clearly inconsistent with the doctrine that the cost of community benefits should be distributed impartially among members of the community.[5]

Hearts Bluff alleges that the government has done to it what *Teague* and *Garrett Brothers* say government cannot do without payment of constitutionally guaranteed compensation.

---

[3] 570 S.W.2d 389, 393 (Tex. 1978) (citation omitted).

[4] TEX. CONST. art. I, § 17(a) ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . .").

[5] 528 S.W.2d 266, 274 (Tex. Civ. App.–San Antonio 1975, writ ref'd n.r.e.) (citations omitted), *quoted and cited with approval in Teague*, 570 S.W.2d at 393-394.

2

Given the procedural posture of the case, Hearts Bluff's allegations must be taken as established facts. Hearts Bluff Game Ranch, Inc. sued the State and the Texas Water Development Board ("TWDB") for a regulatory taking. The defendants moved to dismiss, asserting that Hearts Bluff's pleadings do not state a viable takings claim. The trial court refused to dismiss the case, but on interlocutory appeal, the court of appeals did. The standard of review in this situation is well-settled:

> When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. We construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend.[6]

We must construe all Hearts Bluff's material allegations in its favor and accept them as true.

> Here is what Hearts Bluff pleaded. I quote:

> Hearts Bluff owns a total of approximately 4000 acres of property [that] consists mostly of bottom land, wet land and some upland areas. Hearts Bluff applied for a mitigation banking permit from the Army Corps of Engineers ("the Corps") . . . . Hearts Bluff met all the applicable technical criteria for the issuance of the permit. But the Corps denied the permit because the State Defendants are preparing to construct a water supply reservoir which will include the Hearts Bluff property.

---

[6] *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-227 (Tex. 2004) (citations omitted); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, . . . reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."); *Brown v. Todd*, 53 S.W.3d 297, 305 n.3 (Tex. 2001) ("Because standing is a component of subject matter jurisdiction, we consider [it] as we would a plea to the jurisdiction, construing the pleadings in favor of the plaintiff.").

3

. . . [T]he State Defendants targeted Hearts Bluff property because they feared that the granting of a mitigation banking permit by the Corps would: (1) preempt the State Defendants attempts to acquire the property to construct a reservoir; and/or (2) make property acquisition for the reservoir much more expensive. . . .

. . . [A] mitigation bank would . . . substantially increase the value of Hearts Bluff's property and allow Hearts Bluff to make a very substantial profit on what would otherwise be unprofitable or economically unusable land. . . . There are no viable commercial uses for the property other than mitigation banking. . . . In short, the Hearts Bluff property is not suitable for any profitable uses other than a mitigation bank or a mitigation bank type use. . . . [In using its property as a mitigation bank,] Hearts Bluff would have profited in excess of $10,000,000.00 . . . .

. . . Hearts Bluff acquired the property, which ultimately exceeded 4,000 acres, in 2003-04 for $475.00 per acre. . . .

Before acquiring the property in early 2004, Hearts Bluff and its environmental engineers contacted the Corps to make sure that the property was suitable for a mitigation bank and to make sure there were no impediments to the creation of a mitigation bank. The Corps told Hearts Bluff there were no impediments to pemitting that site . . . . The Corps told Hearts Bluff that the rumored but never established Marvin Nichols Reservoir would not inhibit the granting of a mitigation banking permit for Hearts Bluff.

. . . The notion that a reservoir could be placed where the Marvin Nichols Reservoir is currently proposed had been discussed for many years. However, there had never been any significant interest in or serious studies done on Marvin Nichols and it remained, like hundreds of other pieces of property in Texas, simply a possibility and nothing more. . . .

. . . [I]t was Hearts Bluffs' request for a mitigation bank that caused the State Defendants to raise Marvin Nichols from a notion to a reality.

. . . After receiving the application for a mitigation banking permit in the summer of 2004, the Corps sent public notice to interested and affected parties. . . . It was the notice that elevated the State Defendants interest in Marvin Nichols Reservoir.

. . . TWDB was very concerned about the mitigation bank and immediately undertook to accomplish the denial of Hearts Bluff's permit. TWDB's efforts to block Hearts Bluff's application initially took several forms. Based upon information

4

and belief, Hearts Bluff alleges that the Corps was immediately subjected to intense lobbying by TWDB and Region C to deny Hearts Bluff's application for a permit. Included in these efforts were efforts to discourage . . . Hearts Bluff's nationally known engineering firm[] from continuing to represent Hearts Bluff in connection with the mitigation banking process. Ultimately, these efforts were successful and [the firm] "fired" Hearts Bluff as a client.

. . . In addition, in late 2004 TWDB communicated in writing to the Corps that the proposed Hearts Bluff mitigation bank would negatively affect the development of Marvin Nichols Reservoir. . . .

. . . Beginning in or before December of 2004, TWDB began to formulate a plan to cause the Corps to deny the Hearts Bluff mitigation banking permit and reserve the property for its own purposes. The State Defendants had two (2) concerns. First, the State Defendants were concerned that a mitigation banking permit might preempt the State's later actions to acquire property for Marvin Nichols Reservoir. Second, the State Defendants were very concerned that their costs in creating Marvin Nichols reservoir would be much higher if Hearts Bluff received its permit. Having to mitigate for the Marvin Nichols Reservoir and then mitigate for the lost mitigation which would have been required if Hearts Bluff had been first approved and then condemned as part of the land acquisition process would have substantially increased the cost of the Marvin Nichols Reservoir for the State Defendants. So, the State Defendants acted in their own legal and financial interests to cause the Corps to deny the permit. For all purposes, the State Defendants opposed the permit because they wanted the property for their own use and at a lower price. . . .

. . . In the fall of 2005, the TWDB realized that unless it moved quickly, the Corps was about to approve the Hearts Bluff mitigation banking permit, perhaps as early as January of 2006, because Hearts Bluff had complied with all the requirements for the issuance of the permit. So, TWDB informed the Corps that the Region C Water Plan would include Marvin Nichols as a recommended water management strategy and, for the first time, that it would be designated as a site of unique value for construction of a reservoir. . . . The State Defendants actions were calculated solely to cause the Corps to deny the permit and keep Marvin Nichols as a viable reservoir site. . . . TWDB stepped up its communications with the Corps and continued to impress upon the Corps the fact that the Region C Water Plan not only included Marvin Nichols as a strategy, but also recommended it as a site of unique value for construction and therefore in line for funding and planning.

. . . [T]he granting of the mitigation banking permit would increase the value of the Plaintiff's property by a factor of 100 and would result in increased acquisition costs if and when the State Defendants ever actually sought to acquire the property through negotiation or eminent domain proceedings. This is especially true considering that the value of the property as bottom land was approximately $475 an acre when Hearts Bluff bought it in 2004. On the other hand, the value of the property as a functioning, permitted mitigation bank would be between $10,000 and $25,000 per acre.

. . . If it were not for the State Defendants' actions, the Corps would have granted Hearts Bluff its permit. . . . The acts of the State Defendants, individually and collectively, particularly those in early-mid 2006 were intentional and caused the Corps to deny Hearts Bluff's application.

. . . The policy of the State Defendants is and has been to actively restrict the development of property within the footprint of Marvin Nichols, and other proposed reservoirs, if the proposed development could interfere with the State Defendants' plans for a reservoir or make the reservoir more costly to build in the future. . . .

. . . Other than this request for a mitigation bank, the Fort Worth District of the Army Corps of Engineers has never denied a request for a mitigation banking permit. To the contrary, because wetland mitigation is an important part of the overall Federal regulatory scheme, the Corps actively encourages the creation of mitigation banks. Hearts Bluff is not aware of any mitigation banking permit that has ever been denied, nationwide, other than Hearts Bluffs permit. And, a mitigation bank in the general vicinity of the Hearts Bluff property in the Sulphur River basin, but located outside the footprint of Marvin Nichols, was recently granted a permit by the Corps.

. . . The foregoing acts and omissions of the State Defendants were undertaken to protect the interests of the State Defendants by preventing development of the property as a mitigation bank, because the creation of a mitigation bank would preempt or impede the development of the Marvin Nichols Reservoir. The acts and omissions of the State Defendants were also undertaken to promote the financial interests of the State Defendants by preventing development of the property as a mitigation bank, which would have increased the cost of acquiring the property, at a later date, for Marvin Nichols Reservoir. The State Defendants acts saved them substantial money on future property acquisition costs in violation of Article I, § 17 of the Texas Constitution and the 5th and 14th Amendments of the United States Constitution.

6

. . . Although a public water supply reservoir may be a public use, the State Defendants actions do not advance a legitimate state interest. There is no legitimate state interest in the State Defendants causing millions of dollars in damages to Hearts Bluff and destroying the value of its property just so the property will be cheaper for the State Defendants to acquire. In effect, the State Defendants have created for themselves the functional equivalent of a legislative lis pendens or an option to acquire the Hearts Bluff property, without having to pay for it, as required by Article I, Section 17 of the Texas Constitution and the 5th and 14th Amendments of the United States Constitution.

. . . This targeting was done in order to avoid the preemptive effect of a federal permit and to save the State Defendants substantial sums of money if and when Hearts Bluff is acquired for Marvin Nichols Reservoir.

. . . [T]he Hearts Bluff property would have been worth between $10,000 and $25,000 per acre if the mitigation banking permit had been granted but is now rendered economically idle and valueless.

The court of appeals held that Hearts Bluff's pleading affirmatively negated a takings claim against the State because the decision whether to approve Hearts Bluff's property for mitigation banking was the Corps', not the State's.[7] The court noted that in both *Teague* and *Garrett Brothers*, takings liability was imposed on the entity with regulatory power. The court took as true Hearts Bluff's allegation that but for the State's actions, the Corps would have approved mitigation banking, but explained:

A review of relevant case law leads us to conclude that pleading a valid taking claim requires more than a simple "but-for," cause-in-fact relationship between the state action and the alleged harm. Rather, implicit in the test for inverse condemnation are two understood requirements: (1) the governmental entity against whom the claim is brought must possess — or have possessed during the relevant time period — the regulatory power that effected the taking, and (2) the governmental entity's exercise

---

[7] 313 S.W.3d 479, 489 (Tex. App.–Austin 2010).

of its own regulatory power must have imposed the current, direct restriction that gave rise to the taking.[8]

But the court overlooked our decision in *State v. Biggar*.[9] There, Biggar and others obtained city approval for the development of their property, subject to the State's relinquishment of a channel easement across the property.[10] The State routinely agreed with developers to swap an existing easement for another that would serve the same purpose, and after reviewing Biggar's proposal, it initially approved the exchange.[11] But about the same time, as it happened, the State needed part of Biggar's property for a road improvement.[12] When Biggar insisted on being compensated based on the property's enhanced value as an approved development rather than vacant land, the State withdrew its agreement to exchange easements.[13] The city's approval of the site plan expired, the property's value decreased drastically, and the State then condemned the property.[14] Thus:

> In the same stroke, the State managed to foreclose all opportunity to develop, causing the concomitant reduction in value of not only the portion taken, but the entire Biggar tract. We hold the State's actions resulted in compensable damages under Article I, section 17 of the Texas Constitution.[15]

---

[8] 313 S.W.3d at 487.

[9] 873 S.W.2d 11 (Tex. 1994).

[10] *Id*. at 11. The approved site development plan would expire unless Biggar succeeded in taking all necessary steps to begin construction prior to the city's deadline. *Id*.

[11] *Id*. at 12 & n.2.

[12] *Id*. at 12.

[13] *Id*.

[14] *Id*.

[15] *Id*. at 14.

*Biggar* is a case in which takings liability was imposed, not on the regulatory authority — the city — but on the State for refusing to agree to an easement exchange before the city's approval of Biggar's development plan expired. Similarly, in the present case Hearts Bluff is not suing the regulatory authority — the Corps[16] — but is suing the State for opposing mitigation bank approval. And Hearts Bluff alleges what Biggar proved: that the State acted as it did to depress the value of property and reduce the compensation due the owner in a later condemnation. The State protests that it does not control the Corps, but neither did it control the city in *Biggar*. In both cases, the State took advantage of another entity's regulatory machinery to accomplish its own economic ends at a landowner's expense.

The Court acknowledges that the present case "presents some factual similarities to *Biggar*"[17] but nevertheless concludes that "legally" *Biggar* is "materially different" because there, the State could deny the requested easement, while here, only the Corps could deny the mitigation bank permit. But this distinction is meaningless. In both cases, the State acted within its rights to cause another regulatory authority to deny a permit for land use. Hearts Bluff's petition alleges what *Biggar* proved — that the State acted in bad faith in its own interest — and those allegations must be taken as true.

---

[16] Hearts Bluff did include the Corps in this suit at one point, but the Corps removed the case to federal court, which transferred Hearts Bluff's claims against the Corps to the United States Court of Federal Claims and remanded the claims against the State. The Federal Circuit held that Hearts Bluff did not have a legally cognizable property interest in a mitigation bank instrument to support a taking claim against the Corps. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326 (Fed. Cir. 2012), *cert. denied*, ___ U.S. ___ (2012). Even without such an interest with respect to the Corps, however, Hearts Bluff should be entitled to contend, as the landowner did in *Biggar*, that but for the State's efforts to suppress the value of its property, its mitigation bank application would have been approved.

[17] *Ante* at ___.

The Court correctly observes that *Biggar* "recognized an inverse condemnation claim in part because of the State's bad faith in using its power to gain an unfair economic advantage over the property owner."[18]  That is exactly what Hearts Bluff alleges here.  The Court incorrectly suggests that the State cannot have acted in bad faith in this case because the State merely responded to the Corps' request for public comment on Hearts Bluff's mitigation bank application.  Yet all the State did in *Biggar* was merely refuse to relinquish an easement it owned.  The State was entitled to do with its own property whatever it chose and had no obligation to agree to an exchange of easements.  The State acted no less within its rights in *Biggar* than it claims to have done in the present case, but that did not preclude liability for bad faith in *Biggar*, nor should it do so in this case.

One difference between *Biggar* and the present case is that in *Biggar*, the State, after having caused the value of the landowner's property to be destroyed, proceeded to condemn the part it needed, while here the State has not acted to acquire Hearts Bluff's land.  But the situation in this case is actually worse than in *Biggar*.  Here, the State tells us, Hearts Bluff's bottomland has been "slated for condemnation to make way for a large reservoir"[19] since 1968 but may never be condemned.  The State has not only acted to keep the value of the property low, it may continue to do so without ever deciding to condemn the property.

The State argues that its communications to the Corps were nothing more than a public announcement of future condemnation condoned by this Court in *Westgate v. State*.[20]  In *Westgate*,

---

[18] *Ante* at ___.

[19] Brief of Respondent State of Texas at 1.

[20] 843 S.W.2d 448 (Tex. 1992).

10

the landowner complained of lost income from its inability to lease its shopping center because of prospective tenants' uncertainty over the impact of the State's announced condemnation of part of the property for an adjacent roadway while the State delayed the project for three years.[21] We held that unnecessary delay in condemnation is not a basis for imposing takings liability.[22] The landowner did not allege that the State had intentionally delayed condemnation to depress the value of the property for its own economic advantage. We specifically cautioned that "[t]he policy reasons that support our decision today might not be applicable where the condemning authority is accused of intentionally injuring a landowner."[23]

If Hearts Bluff's position is correct, the State worries, it will never be allowed to express concerns on behalf of the public to regulatory authorities without risking liability. But this is simply not true. Hearts Bluff does not fault the State merely for acting in the public interest. Rather, Hearts Bluff complains that the State has furthered its own economic interests by intentionally injuring Hearts Bluff's interests. This is precisely what we condemned in *Teague*, *Garrett Brothers*, and *Biggar*.

In *Westgate*, we stated that "publicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property."[24] The State argues that there

---

[21] *Id*. at 451.

[22] *Id*. at 454.

[23] *Id*.

[24] *Id*. at 453.

11

is no such restriction on Hearts Bluff's use of its property, but there is: Hearts Bluff cannot use its property as a mitigation bank. A denial of permission to develop property for which the owner would otherwise qualify was a direct restriction in *Teague*, *Garrett Brothers*, and *Biggar*.

The State argues that Hearts Bluff has no right to the Corps' approval of a mitigation bank. But the landowners in *Teague*, *Garret Brothers*, and *Biggar* had no right to their proposed developments, either. The evidence in all three cases was only that approval would not have been withheld but for the government's own contrary economic interest. Hearts Bluff has alleged that the Corps has never rejected a mitigation bank proposal in the history of the program, and that although it rejected Hearts Bluff's, it approved one nearby. We must take these allegations as true.

Finally, the Court speculates that Hearts Bluff's loss of property value has not been substantial enough for a taking. But Hearts Bluff has alleged that its property's value as a mitigation bank would be $10,000-25,000 per acre, and that without a mitigation bank permit, the bottomland is not worth the $475 per acre Hearts Bluff paid to acquire it. Again, we must take these allegations as true.

Imposing regulatory taking liability on the government is not easy, but neither is it impossible. President Reagan famously remarked that he had always felt "the nine most terrifying words in the English language are: 'I'm from the government, and I'm here to help.'"[25] Hearts Bluff has alleged facts that, if proven, could show that the State intentionally injured Hearts Bluff to

---

[25] President's News Conference August 12, 1986, available from the Ronald Reagan Presidential Library Archives, http://www.reagan.utexas.edu/archives/speeches/publicpapers.html (last visited August 24, 2012), and the University of Santa Barbara American Presidency Project, http://www.presidency.ucsb.edu/index_docs.php (last visited August 24, 2012).

advance its own economic interests.  The Court simply cannot bring itself to take as true, as it must in reviewing a dismissal on the pleadings, a landowner's allegation that its development plans were scuttled, and the value of its property ruined, by a state agency intent on keeping its condemnation options open indefinitely.  The allegation is dubious, the Court says, because "[t]here is no evidence in the record showing that the State acted in bad faith."[26]  This is no surprise, of course, because at the State's insistence, there has been little discovery and no trial.  The surprise is that a landowner loses his case for not supporting his allegation with evidence it never had an opportunity to produce. Which is the kind of thing that helps explain, I suppose, why President Reagan felt the way he did.

     I respectfully dissent.

 

 

_____

Nathan L. Hecht
Justice

OPINION DELIVERED: August 31, 2012

---

[26] *Ante* at ___.

13